| | | |
|---|---|---|
| | AUSA: John McCormack IV | Telephone: (202) 262-7011 |
| AO 106 (Rev. 04/10) Application for a Search Warrant   Agent: | Stephen T. Osterling | Telephone: (313) 815-7887 |

# UNITED STATES DISTRICT COURT

for the
Eastern District of Michigan

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

NEW BEGINNINGS ADULT CENTER
INC. / OAKVIEW ADULT DAY CARE
18954 – 18966 Greenfield Road
Detroit, Michigan 48235

)
)
)
)
)
)

Case No.

Case: 2:19-mc-51174 -1
Judge: Battani, Marianne O.
Filed: 08-14-2019 At 11:19 AM
IN RE:SEALED MATTER(SW)(MLW)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the _____ Eastern _____ District of _____ Michigan _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347 & 1349 | Health Care Fraud & Conspiracy to Commit Health Care Fraud |
| 18 U.S.C. § 371 | Conspiracy to Defraud the United States and Pay Health Care Kickbacks |

The application is based on these facts:

See attached AFFIDAVIT.

- ☐ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Stephen T. Osterling
*Printed name and title*

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date: August 14, 2019

City and state: Detroit, MI

*Judge's signature*

Hon. Anthony P. Patti          U. S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF:<br>THE SEARCH OF<br><br>NEW BEGINNINGS ADULT<br>CENTER INC. / OAKVIEW ADULT<br>DAY CARE<br>18954 – 18966 Greenfield Road<br>Detroit, Michigan 48235 | Case No. _____<br><br>**Filed Under Seal**<br><br>Case: 2:19-mc-51174 -1<br>Judge: Battani, Marianne O.<br>Filed: 08-14-2019<br>IN RE:SEALED MATTER(SW)<br>(MLW) |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Stephen T. Osterling, Special Agent for the Federal Bureau of

Investigation, being duly sworn, depose and state as follows:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application under Rule 41

of the Federal Rules of Criminal Procedure for a search warrant for the

premises of New Beginnings Adult Center Inc. ("NEW BEGINNINGS")

located at 18954 - 18966 Greenfield Road, Detroit, Michigan ("Subject

Premises"), located within the Eastern District of Detroit.

2.    Based upon information obtained by the Federal Bureau of

Investigation (FBI) and Department of Health and Human Services Office of

the Inspector General (HHS-OIG) there is probable cause to believe, and I

1

do believe, that EMORY MATTHEWS is (a) engaging in health care fraud and submitting or causing the submission of false and fraudulent claims to Medicare for services that were not medically necessary and/or were not provided; and (b) engaging in the solicitation and receipt of illegal kickback payments in connection with services billed to a Federal health care program.  Further, there is probable cause to believe that the Subject Premises has evidence of these crimes.

3.      The Subject Premises to be searched is more fully described in the following paragraphs and in Attachment A.  In Attachment B, I more fully describe the documents, patient files, computers, currency, and other evidence and instrumentalities of criminal conduct to be seized.

4.      I am a Special Agent with the FBI, duly appointed according to law and acting as such, and have been employed as such since May 2010.   I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations and to make arrests.

5.      As a Special Agent in the FBI, I have received general law enforcement training at the FBI Academy, as well as specialized training on the subjects of health care fraud, money laundering and telephone analysis from the FBI, and I have been personally involved in investigations

concerning health care fraud, prescription drug diversion, and methods used to finance and conceal the proceeds of those operations.  I have investigated and conducted surveillance on numerous doctors, pharmacies, and prescription drug dealers.  I have consulted with agents and officers of numerous federal, state, and local agencies to gain an understanding of current trends in the diversion of prescription drugs and health care fraud.  I am currently assigned to the Detroit division of the FBI and my duties include investigating health care fraud and prescription drug diversion.

6.     As a Special Agent with the FBI, I am responsible for investigating violations of United States federal law, including, but not limited to Title 18, United States Code, Section 1347 (Health Care Fraud); Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud); 42 U.S.C. § 1320a-7b(b)(1)(A) and 1320a-7b(b)(2)(A) (Payment and/or Receipt of Health Care Kickbacks); and 21 U.S.C. § 841 (Unlawful Distribution of a Controlled Substance).  In connection with investigating these offenses, I have participated in the execution of search warrants for documents and other evidence in cases involving violations of these offenses.

7.     I have knowledge of the facts set forth in this affidavit as a result of my participation in the investigation and information provided to

me by other law enforcement agents.  Information pertinent to this investigation was also provided by AdvanceMed, a private entity which contracts with HHS to act as the zone program integrity contractor ("ZPIC") for Michigan.  The ZPIC is responsible for the protection of the Medicare Trust Fund and conducts investigations and audits designed to protect the Medicare program from waste, fraud, and abuse.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.     Based on my training and experience, and the information set forth below, there is probable cause to believe that certain evidence, and fruits and instrumentalities, supporting violations of the following federal criminal statutes is presently maintained or stored at the Subject Premises:

   a.  Title 18 U.S.C. § 1347, Health Care Fraud;

   b.  Title 18 U.S.C. §1349, Conspiracy to Commit Health Care Fraud;

   c.   Title 42, U.S.C. § 1320a-7b(b)(2)(A), Payment of Kickbacks in Connection with a Federal Health Care Program;

   d.  Title 42 U.S.C. § 1320a-7b(b)(1)(A) Soliciting and/or Receiving Kickbacks in Connection with a Federal

4

Health Care Program; and

    e.  Title 18 U.S.C. § 371, Conspiracy to Defraud the United

States and Pay Health Care Kickbacks.

## II.    <u>VIOLATION STATUTES</u>

9.    Title 18, United States Code, Section 1347, prohibits health care fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice — (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

10.    Title 18, United States Code, Section 1349, provides that any person who attempts or conspires to commit health care fraud shall be subject to the same penalties as those proscribed in 18 U.S.C. § 1347.

11.    Title 18, United States Code, Section 24(b), defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is

providing a medical benefit, item, or service, for which payment may be made under the plan."

12.     Title 42, United States Code, Section 1320a-7b(b)(2)(A), prohibits knowingly and willfully offering and paying any remuneration (including any kickback, bribe, or rebate) in return for referring an individual to a person for the furnishing or arranging of any item or service for which payment may be made in whole or part by Medicare, a federal health care benefits program as defined by 18 U.S.C. § 24(b).

13.     Title 42, United States Code, Section 1320a-7b(b)(1)(A), prohibits the solicitation and receipt of any remuneration, whether direct or indirect, in return for referring an individual to a person for the furnishing or the arranging of furnishing of any service for which payment may be made under a Federal health care program.

14.     Title 18, United States Code, Section 371 provides that it a criminal offense "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner for any purpose."

### III.   THE MEDICARE PROGRAM

#### A. OVERVIEW

15.     The Medicare Program ("Medicare") is a federally-funded health care program providing benefits to persons who are over the age of sixty-five or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency within HHS.  Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."

16.     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

17.     Medicare has four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D).  More specifically, Part A covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation.  Part B covers the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A.

18.     By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required

to abide by all the Provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations issued by CMS and its authorized agents and contractors.

19.     Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for at least a period of six years.

20.     This investigation involves home health care. Home health care services typically involve skilled nursing, physical therapy, and speech pathology services to homebound patients. Home health and adult day center services are covered by Part A.

21.     This investigation also involves psychotherapy services provided in residential building settings that are covered by Medicare Part B.  Under Medicare Part B, services must be medically necessary and provided by licensed physicians or otherwise qualified medical professionals.  Medicare claims for Part B services are processed and paid by Medicare Administrative Contractors, known as MACs, who contract with CMS to administer specific parts of the Medicare program in specific jurisdictions.

22.     CMS relies on a network of MACs to process Medicare claims, and MACs serve as the primary operational contact between the Medicare Fee-For-Service program, and approximately 1.5 million health care

providers enrolled in the program.  MACs enroll health care providers in the Medicare program and educate providers on Medicare billing requirements, in addition to answering provider and beneficiary inquiries.

23.     Medicare claims for Parts A and B are processed and paid by insurance organizations known as fiscal intermediaries and carriers, respectively, who contract with CMS to administer their specific part of the Medicare program.

24.     Medicare will not pay for or reimburse services that are procured by kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b).

## B. HOME HEALTH CARE REQUIREMENTS

25.      Medicare's regulations for home health services require a home health agency ("HHA") to be licensed by the state in which it is located, submit an application to Medicare, and be certified by a state agency. A qualified HHA receives a Medicare provider number that is used for the submission, processing, and payment of claims.

26.     Medicare coverage for home health services requires that the following qualifying conditions, among others, be met: (a) the Medicare beneficiary is "homebound" and does not have a willing care-giver to assist him or her; (b) the beneficiary needs skilled nursing services, physical

therapy, or occupational therapy; (c) the beneficiary is under the care of a qualified physician who established a written Plan of Care for the beneficiary, signed by the physician and by a Registered Nurse (RN) (or therapist if only therapy services are provided) from the HHA; (d) skilled nursing services are provided by, or under the supervision of, an RN in accordance with the Plan of Care; and (e) the services provided are medically necessary.

27.   A beneficiary is considered "homebound" if he or she has a condition, due to an illness or injury, that restricts his or her ability to leave the home except with the aid of another individual or a supportive device, or if the beneficiary has a condition such that leaving his or her home is medically contraindicated.

28.   To determine the proper level of care for a particular beneficiary, Medicare requires that HHAs perform a comprehensive initial evaluation, which includes a patient-specific, comprehensive assessment that accurately reflects the patient's current health and provides information to measure the patient's progress. Medicare requires that (1) an RN or qualified therapist perform the initial assessment (on an OASIS form), and (2) HHAs maintain a clinical record of services they provide to each beneficiary, including signed and dated clinical and progress notes recording each home visit made to the beneficiary (Skilled Nursing Notes). Skilled Nursing Notes must include the

identity of the individual who performed the visit, the name of the patient, and the type of service performed.

29.     Medicare compensation to HHAs is based upon a prospective payment system (PPS), which pays the HHA a base payment that can be adjusted to reflect the severity of the beneficiary's condition and care needs. Medicare PPS pays HHAs for every 60-day "episode" of services provide to each beneficiary. At the beginning of an episode, Medicare will pay 60 percent of the cost of the episode once the patient has been evaluated and a Plan of Care determined. At the end of the episode, Medicare pays the balance based on how much home health care was actually provided in the episode. If the beneficiary is still eligible for care at the end of the episode, a second episode of services can be provided. Each subsequent episode must be based upon a new assessment of the patient, including a new OASIS form, wherein the beneficiary's physician and RN (or therapist) re-certifies the beneficiary's medical condition, need for services, and a new Plan of Care.

## C. SOCIAL WORKER – PSYCHOTHERAPY SERVICES

31. Medicare Part B covers clinical social worker services (see generally 42 C.F.R. § 410.73) furnished for the diagnosis and treatment of mental illness that the clinical social worker ("CSW") is legally authorized to perform under State law and the services must be of a type that would be

covered if they were furnished by a physician or as an "incident to" a

physician's professional service and must meet the requirements of this

section.  42 C.F.R. § 410.26 states that Medicare Part B pays for services

and supplies "incident to" the service of a physician (or other practitioner)

and the services and supplies must be furnished under the direct supervision

of the physician (or other practitioner).  Direct supervision means the level

of supervision by the physician (or other practitioner) of auxiliary personnel

as defined in 42 C.F.R. § 410.32(b)(3)(ii), which defines direct supervision

in the office setting as meaning the physician must be present in the office

suite and immediately available to furnish assistance and direction

throughout the performance of the procedure.

32.     Local Coverage Determinations (LCD) are defined in Section

1869(f)(2)(B) of the Social Security Act (the Act). This section states:  "For

purposes of this section, the term 'local coverage determination' means a

determination by a fiscal intermediary or a carrier under Part A or Part B, as

applicable, respecting whether or not a particular item or service is covered

on an intermediary or carrier-wide basis under such parts, in accordance

with Section 1862(a)(1)(A)."  LCDs are created by the MACs.

33.     LCD A54829, titled "Clinical Social Worker Services",

effective February 1, 2016, states Services furnished as an incident to CSW

personal professional services are not covered. (Medicare Learning Network Mental Health Services, ICN 903195, January 2015).

34.    LCD 30489 titled "Psychiatry and Psychological Services" applied to the primary geographical jurisdiction of Michigan.  LCD 30489 was archived and LCD L34616, which became effective October 1, 2015, is the active LCD pertaining to Psychiatry and Psychology services.

35.    LCDs 30489 and L34616 specified that Medicare coverage of psychotherapy does not include teaching grooming skills, monitoring activities of daily living (ADL), recreational therapy (dance, art, play), or social interaction. It also does not include oversight activities such as house or financial management. Personal and group dynamics are discussed and explored in a therapeutic setting allowing emotional catharsis, instruction, insight, and support.  When covered by Medicare, the group size should be of a size that can be successfully led (e.g., maximum of 12 people). For Medicare coverage, group therapy does not include:  socialization, music therapy, recreational activities, art classes, excursions, sensory stimulation or eating together, cognitive stimulation, or motion therapy.

## IV.    PROBABLE CAUSE

30.    In April 2019, a Confidential Human Source (CHS-1), whose information was previously found to be timely, reliable, and credible,

provided information regarding alleged health care fraud and illegal kickback payments occurring in Detroit, Michigan.  CHS-1 was identified by the FBI during its investigation into a health care fraud scheme unrelated to the subject matter of this affidavit.  CHS-1 pled guilty to one count of Title 18 U.S.C. §1349, Conspiracy to Commit Health Care Fraud in connection with his/her role in that matter in early 2018.

31.    In May 2019, the FBI and HHS-OIG initiated an investigation into this activity.  The investigation included public complaints, witness interviews, surveillance operations, medical billing records, and CHS-1 recordings made under the supervision of law enforcement.

### A. CORPORATE RECORDS

32.    According to the Michigan Department of Licensing and Regulatory Affairs ("LARA") website, Oakview Adult Day Care ("OAKVIEW") was incorporated on September 30, 2014, with the expressed purpose to "watch elderly people in the daytime that can't stay home by themself [sic]."  The incorporators were EMORY MATTHEWS ("MATTHEWS"), Janay Schaffer, and Yolanda Matthews, known to be MATTHEWS' wife.  The 2015, 2016, and 2017 annual filings were all filed on August 17, 2017.  These filings listed the business address as 18966

14

Greenfield Road, Detroit, Michigan.

33.     A Certificate of Correction was filed with LARA on October 22, 2014, to add Zahir Shah ("SHAH") to the OAKVIEW company filing. In July 2017, SHAH was indicted by the United States District Court for the Eastern District of Michigan on one count of conspiracy to commit health care fraud, one count of conspiracy to pay and receive health care kickbacks, and two counts of payments of kickbacks in connection with a federal health care program in connection with operation of the home health company Exceptional Home Health Care Inc. from 2007 to July 2017. *See case no. 2017-cr-20467.* On April 22, 2019, SHAH pled guilty to one count of Conspiracy to Commit Health Care Fraud and Wire Fraud and one count of Conspiracy to Pay and Receive Health Care Kickbacks. *Id.*

34.     According to LARA, NEW BEGINNINGS was incorporated on June 8, 2018, with Javon Brown listed as the Resident Agent. Yolanda Matthews was identified as the company's President, Treasurer, Secretary, and Director. The company's address was listed as 18954 Greenfield Road, Detroit, Michigan. This was consistent with Medicare's billing records, which identify both Javon Brown and Yolanda Matthews as owners. Yolanda Matthews is further identified as CEO.

## B. INTERVIEWS/MEDICARE DATA

35.     CHS reported that MATTHEWS was the owner/operator of multiple adult foster homes and an adult day care facility, OAKVIEW. Each day, MATTHEWS arranged for the residents of his foster homes to be transported from their homes to OAKVIEW.  At OAKVIEW, the patients all appeared to be drug addicts, homeless people, and people with mental illness.  Patients were sleeping throughout the facility, including being "passed out in closets."  CHS did not observe any indication that any services were being rendered to the patients.

36.     According to billing information from Medicare, OAKVIEW was enrolled as a Medicare provider as of October 14, 2014.  The current address for the company is 18966 Greenfield, which was effective as of December 1, 2015.  Janay Schaffer is listed as the owner of the company and Yolanda Matthews as a "Managing Employee".

37.     Affiant reviewed Medicare billing records for OAKVIEW. Between April 1, 2014, and January 24, 2019, OAKVIEW billed Medicare approximately $4.6 million and was paid $2.0 million. Nearly all (99%) of these billings were for psychotherapy and group psychotherapy.

38.     Investigators became aware that around January 2019, MATTHEWS stopped billing under OAKVIEW and began billing under a

new entity, NEW BEGINNINGS, for the same practices. NEW BEGINNINGS became a Medicare provider on or about September 15, 2018. Between January 16, 2019, and April 29, 2019, NEW BEGINNINGS billed Medicare approximately $291,000 and was paid $142,000 in connection with approximately 4,585 claims submitted on behalf of 81 beneficiaries. Again, 99% of these billings were for psychotherapy and group psychotherapy. Likewise, all 81 of Medicare beneficiaries for which NEW BEGINNINGS submitted claims for services had the exact same primary diagnosis code, F329, "Major depressive disorder, single episode, unspecified." Based on my training and experience, I know that when a Medicare provider's patients all have the exact same primary diagnosis that is a possible indicator of fraud. Outside of a few highly specialized medical practices, it is unusual to see such a high percentage of a single diagnosis. Based on my training and experience, this occurs at practices engaged in health care fraud so that the practice can use this inappropriate diagnosis in order to justify procedures that are not medically necessary.

39. In May 2019, Affiant interviewed a former employee of OAKVIEW, Employee DG. Employee DG is a social worker and worked at OAKVIEW for four days around February 2018 before leaving the company. Employee DG stated many of the patients at OAKVIEW were not

17

cognizant enough to participate in psychotherapy. As such, services for these patients should not be billed to Medicare. Employee DG stated that the owner, MATTHEWS, wanted DG to bill for everyone and DG refused. Employee DG was informed by investigators that OAKVIEW billed Medicare for $3,000 using Employee DG's National Provider Identification ("NPI") number. In response, Employee DG opined, "That's too much."

40. In June 2019, Affiant interviewed HW, whose brother was a resident of one of MATTHEWS' foster homes and a patient at OAKVIEW. HW, who was his brother's guardian, had previously filed a complaint with Medicare after seeing his brother's Explanation of Benefits from Medicare. HW observed his brother's insurance was billed for daily psychotherapy sessions. His brother told HW that he was not receiving these therapy services. Additionally, HW opined that his brother was so heavily medicated that he would not have been able to receive these services. HW confronted MATTHEWS about this. MATTHEWS' response was to tell HW if he was not satisfied with his brother's care, HW could take his brother to another facility, which HW did.

41. HW noted that his brother was a patient at OAKVIEW for approximately two months. Affiant reviewed OAKVIEW's Medicare billing data which showed that OAKVIEW billed for therapy services

purportedly rendered to HW's brother on twenty-seven days between November 15, 2016, and January 4, 2017. These services were billed to Medicare for $3,250 and OAKVIEW received payment of $1,025 from Medicare.

42.     Medicare billing records for OAKVIEW indicate that OAKVIEW billed Medicare for 30.5 hours of psychotherapy services purportedly performed by Licensed Clinical Social Worker ("LCSW") Jerel Bickerson on December 22, 2017. These claims were in connection with services purportedly rendered to 16 Medicare beneficiaries. These services were billed to Medicare for $2,025 and OAKVIEW received a payment of $373.80 from Medicare.

43.     Medicare billing records also indicate that OAKVIEW billed Medicare for 15 hours of psychotherapy services purportedly performed by Bickerson on December 13, 2017. These claims were in connection with services purportedly rendered to 22 Medicare beneficiaries. These services were billed to Medicare for $2550 and OAKVIEW received a payment of $765.20 from Medicare.

44.     Medicare billing records also indicate that OAKVIEW billed Medicare for 16 hours of psychotherapy services purportedly performed by LCSW Philip Jackson on December 12, 2017. These claims were in

connection with services purportedly rendered to 24 Medicare beneficiaries. These services were billed to Medicare for $2720 and OAKVIEW received a payment of $912 from Medicare.

45.     Medicare billing records for OAKVIEW indicate that OAKVIEW billed Medicare for 15 hours of psychotherapy services purportedly performed by LCSW Cynthia Reynolds on December 16, 2015. These claims were in connection with services purportedly rendered to 29 Medicare beneficiaries.  These services were billed to Medicare for $2,100 and OAKVIEW received a payment of $800.94 from Medicare.

46.     Likewise, Medicare billing records for NEW BEGINNINGS indicate that NEW BEGINNINGS billed Medicare for 18 hours of psychotherapy services purportedly performed by LCSW Melanie Chismody on July 16, 2019. These claims were in connection with services purportedly rendered to 9 Medicare beneficiaries.  These services were billed to Medicare for $3,150 and OAKVIEW received a payment of $737.82 from Medicare.

47.     Similarly, Medicare billing records for NEW BEGINNINGS indicate that NEW BEGINNINGS billed Medicare for 18 hours of psychotherapy services purportedly performed by LCSW Delano Willis on the same day, July 16, 2019. These claims were in connection with services

purportedly rendered to 9 Medicare beneficiaries.[1]  These services were billed to Medicare for $3,150 and OAKVIEW received a payment of $983.70 from Medicare.

48.     Based on my training and experience, these are all abnormally high numbers of total hours of service billed for a given day and are possible indicators of health care fraud.

### C. SHAH INVESTIGATION

49.     In connection with the investigation into SHAH, special agents from the FBI and other federal agencies conducted interviews of employees of SHAH.  Among these was Employee KY who was interviewed in February 2018.  Employee KY stated MATTHEWS recruited patients for SHAH's home health care agency.  Employee KY described that MATTHEWS recruited patients from an adult day care located near 7 Mile Road and Greenfield Roads (which Affiant knows to describe 18954 - 18966 Greenfield) and wanted all of his patients to get both home health care and go to adult day care.  Employee JE, interviewed in April 2018, also knew MATTHEWS to be a patient recruiter and recalled seeing MATTHEWS at SHAH's office.

---

[1] Of these 9 Medicare beneficiaries that purportedly received services from LCSW Delano Willis on July 16, 2019 there were 3 Medicare beneficiaries that also had claims of services purportedly rendered by LCSW Melanie Chismody also on July 16, 2019.

## D. HOME HEALTH COMPANY A

50.     CHS-1 further reported that representatives from home health care agencies came to OAKVIEW to see patients.  The representatives had the patients sign visit logs as if they received home health care services such as physical therapy, but no such services were rendered.  The representatives then paid illegal kickbacks to MATTHEWS in exchange for the ability to sign up the patients with the home health care agency.

51.     For example, CHS-1 stated that on March 26, 2019, CHS-1 observed seven patients sign visit logs for Company A, a home health care agency who is enrolled as a Medicare provider, despite no services being rendered to those patients.  While the patients were signing the logs, CHS-1 observed the owner of Company A, identified as Individual A, give MATTHEWS cash in exchange for the referrals of these patients.  Individual A told CHS-1 he pays MATTHEWS $400 to $500 per patient referral.

52.     One of these patients was identified by CHS-1 as Patient MM. Affiant reviewed Medicare billing data for Company A.  Affiant observed that Company A billed Medicare for a home health care episode for Patient MM beginning on February 12, 2019, and ending on April 6, 2019.  The billing records reflected that Company A provided twelve physical therapy visits "performed by a qualified physical therapist in the home health or

22

hospice setting" to include a visit on March 26, 2019. In connection with this home health care episode, Company A was paid $3,622 by Medicare. OAKVIEW and NEW BEGINNINGS combined to bill Medicare $11,255 for services purportedly rendered to Patient MM between September 25, 2018, and April 23, 2019.

53.     Affiant compared Medicare billing records for Company A, OAKVIEW, and NEW BEGINNINGS. Company A shared 11 patients with OAKVIEW and/or NEW BEGINNINGS between January 1, 2014, and June 6, 2019. During that time period, Company A billed these Medicare for these patients for a total amount of approximately $25,000.

### E. HOME HEALTH COMPANY B

54.     On multiple occasions, CHS-1 observed a physical therapist from another home health care agency enrolled as a Medicare provider, Company B, at OAKVIEW. On one occasion, the physical therapist showed CHS-1 a list of patient names he was there to see. The list had the names of approximately twenty patients.

55.     CHS-1 reported that on multiple occasions MATTHEWS told CHS-1 that Company B pays him $800 per patient referral. During one of these conversations on June 14, 2019, which was recorded by CHS-1 and has been reviewed by Affiant, MATTHEWS stated he charges Company B

$800 per patient but only makes $500 because he has to pay $300 to a middle man.  In another recorded conversation on June 3, 2019, MATTHEWS stated Company B typically pays him $5,000 at a time:

> MATTHEWS: They give me like 5,000 at a time.
>
> CHS-1: Who does?
>
> M: [Company B].
>
> CHS-1: Oh, shit.
>
> M: [Company B] is good people, man.

56.     Affiant compared Medicare billing records for Company B, OAKVIEW, and NEW BEGINNINGS.  Company B shared 27 patients with OAKVIEW, and/or NEW BEGINNINGS between January 1, 2014, and June 6, 2019.  During that time period, Company B billed these Medicare for these patients for a total amount of approximately $78,000.

### F. CHS RECORDINGS

57.     CHS-1 reported that MATTHEWS approached CHS-1 and asked if CHS-1 was interested in purchasing patients from MATTHEWS for CHS-1 to bill to Medicare for home health services.  Initially, MATTHEWS offered to sell patients to CHS for $800 per patient.  In a subsequent conversation on May 22, 2019, which was consensually recorded by CHS-1 and has been reviewed by Affiant, CHS-1 and MATTHEWS agreed to a

price of $700 per patient and an initial purchase of two patients.

58.     On June 3, 2019, the investigative team provided CHS-1 with $1,400 cash to be used to complete this transaction which was recorded for both audio and video.  During the meeting, CHS-1 asked MATTHEWS if MATTHEWS was able to get two patients.  MATTHEWS responded, "No, I ain't did nothing 'til get money."  Later, MATTHEWS told CHS-1, "They [Company B] norm give me 8, I told you 7."

59.     Later in the conversation, CHS-1 asked if he could get two patients later in the week, stating CHS-1 will pay MATTHEWS upfront. MATTHEWS responded, "Yeah, this Thursday I get you two.  But I can't do a whole lot because I'm obligated to them [Company B]."  Later on, CHS-1 asked if they were good on "what we agreed upon," and MATTHEWS answered, "Yeah, yeah.  We'll do two...Okay, so 14?" CHS-1 then provided the $1,400 to MATTHEWS, which MATTHEWS then counted.

60.     At the conclusion of the meeting, MATTHEWS told CHS-1, "Keep that between me and you."  When CHS-1 asked what MATTHEWS was talking about, MATTHEWS stated, "You know, the business." MATTHEWS directed CHS-1 not to talk about their business on the phone, stating, "And then, um, we ain't gonna talk on the phone."

25

61. On June 4, 2019, CHS-1 received a text message from (313) 573-9000 ("Subject Device 1") which read: "Heck info for mr Matthews" and provided the names of two patients and their identifiers, to include the patients' Medicare identification number, also known as the HIC number. Based on my training and experience, it is apparent that presumably, the person sending the text message was referring to this number when s/he wrote "Heck info".

62. CHS-1 and MATTHEWS had multiple conversations regarding the physician home health care referrals for these patients. These conversations were recorded by CHS-1 and reviewed by Affiant. MATTHEWS explained that his doctor delayed several times and promised to get the necessary forms authorizing home health services to CHS-1 shortly. In the meantime, MATTHEWS wanted CHS-1 to purchase additional patient information. On June 12, 2019, MATTHEWS sent CHS-1 a picture message from phone number (248) 259-9495 ("Subject Device 2") of a list of 17 patients and their identifying information. MATTHEWS also wrote these patients would "be it until late July" and that if CHS-1 "want[ed] more I need to know today or tomorrow."

63. On June 14, 2019, the investigative team provided CHS-1 $1,400 to purchase two additional patients from MATTHEWS. Later that

day, CHS-1 met with MATTHEWS and this meeting was again recorded for both audio and video. During this meeting, MATTHEWS called a doctor on speakerphone, telling CHS-1 the doctor would provide verbal authorization to open the patients for home health care. Once the doctor was on the phone, the doctor was not willing to provide verbal authorization to open the patients for home health care, but indicated he would prepare the necessary paperwork the next week and send it to CHS-1. While CHS-1 and MATTHEWS further discussed the logistics of getting the forms to CHS-1, MATTHEWS showed CHS-1 a text message conversation between MATTHEWS and the doctor and said, "I sent him your stuff right there, who to send it to."

64. CHS-1 gave the $1,400 to MATTHEWS in exchange for two more patients. MATTHEWS stated he wanted CHS-1 to be his main partner for this. After MATTHEWS counted the money, he and CHS-1 discussed future transactions:

> MATTHEWS: I'm gonna send you a lot, hopefully.
>
> CHS-1: Perfect.
>
> M: I get paid more dealing with you then-
>
> C: Yeah.
>
> M: -going through them.

Later in the meeting, MATTHEWS continued the conversation:

> M: Next week you come Thursday?
>
> C: Yup.
>
> M: You think you can do another two?

And later again:

> M: If you get your stuff Monday, do you think-
>
> C: Yeah.
>
> M: -you can do at least three?

65.     On June 18, 2019, CHS-1 received via fax the physician referral forms for five patients from a physician located in Metro Detroit.  The forms identified the physician as working for Company C.  Regarding the extra patient, MATTHEWS told CHS-1 to take care of him the next time they saw each other.

### G. USE OF PHONES

66.     CHS-1 reported to have multiple interactions with MATTHEWS and/or his representatives via phone.  CHS-1 provided five phone numbers related to MATTHEWS: Subject Device 1, Subject Device 2, (313) 433-3673 ("Subject Device 3"), (313) 397-1611 ("Office Line 1") and (313) 307-2539.  CHS-1 described Subject Device 2 as MATTHEWS' primary contact number, but stated MATTHEWS did not like to talk about

criminal activity on this line. MATTHEWS was more willing to have these discussions on Subject Device 3. Office Line 1 was the number for the phone in MATTHEWS' office, though other employees may answer that phone is MATTHEWS is not there. CHS-1 did not have much information regarding Subject Device 1 other than the messages CHS-1 received from that number which are described below. MATTHEWS had provided (313) 307-2539 to CHS-1 as one of his contact numbers during one of their first interactions, but CHS-1 had not spoken with MATTHEWS using that number.

67.     Records related to Subject Device 2, were obtained from Sprint via subpoena. These records identify the subscriber as Lillie Brown, 38855 Plumbrook Drive, Farmington Hills, Michigan. This address is the known residence of MATTHEWS. Tolls records show this number had 37 voice calls with CHS-1's phone number between April 3 and June 13, 2019. CHS-1 also provided documentation that MATTHEWS contacted CHS via picture message ("MMS") and text message ("SMS") from this number on June 12, 2019.

68.     As previously noted, on June 12, 2019, MATTHEWS sent CHS-1 an MMS from phone number Subject Device 2 with a list of 17 patients and their identifying information. The CHS-1 responded via SMS

by saying CHS-1 would look into these patients and asked if MATTHEWS would provide the physician referral forms which authorize home health services, also known as Face-to-Face forms, for two patients the CHS-1 previously purchased by the next Friday.  MATTHEWS responded via SMS, "Yes this week but if you want more I need to know today or tomorrow".

69.    Later that same day, CHS-1 and MATTHEWS had two voice calls using Subject Device 3, which were reflected in the toll records from Sprint and which CHS-1 recorded.  Affiant reviewed these recordings.  In these calls, they discussed two patients that CHS-1 selected from the list of 17 patients that MATTHEWS previously sent and MATTHEWS expressed that he needed payment for those two by the next Friday.  He stated, "I definitely need it Friday…'Cause tomorrow everything else will be gone."

70.    On June 13, 2019, CHS-1 and MATTHEWS had more phone calls using Subject Device 3 as reflected in the toll records from Sprint and which were recorded by CHS-1.  Affiant reviewed these recordings.  During these, MATTHEWS explained there were some issues with some of the patients which MATTHEWS had given to CHS-1 but had other patients to replace those.  MATTHEWS stated, "I still got four for you…" and listed the patient names.  CHS-1 and MATTHEWS again discussed the Face-to-Face forms which CHS-1 needed to open the patients for home health care.

MATTHEWS stated that he would not be able to provide the forms

immediately, but proposed an alternative:

> MATTHEWS: I can get him [the doctor] to give you a verbal
>
> and you can open 'em when you come…
>
> CHS-1: I need written orders.  Without that Face-to-Face, I
>
> can't bill nothing.

71.     MATTHEWS also referred to Company B by name.  Referring

to the list of 17 patients that he previously sent to CHS-1, MATTHEWS

would provide the patients owed to CHS-1 and the rest, "Well, I'm gonna

send the rest to, to, um, [Company B] next week."

72.     On June 17, 2019, CHS-1 and MATTHEWS had additional

voice calls using Subject Device 3.  These calls were outside of the scope of

the toll records but were recorded by CHS and reviewed by Affiant.  During

these calls, MATTHEWS explained there was a problem with the patients he

promised to CHS-1.  "They made a mistake.  And the people just sent two of

them over to [Company B] but it's supposed to came to you."  MATTHEWS

then described how he would prevent this in the future: "I'll use that doctor

for, for [Company B] and the doctor who sent you the stuff, I'll use them for

you strictly."

73.     On June 18, 2019, MATTHEWS contacted CHS-1 and tried to

have CHS-1 purchase additional patients.  CHS-1 believed MATTHEWS

called him using Subject Device 3.  CHS-1 recorded this conversation,

which Affiant reviewed.  The conversation included the following exchange:

> MATTHEWS: Hey, um, I got five more I got to get over to
>
> you…Yeah I got, I got my- this Saturday is my wife
>
> birthday party, right?  And it's her birthday, so, ah man, I'm
>
> kinda hit.  If I send it to the other place I gotta wait.  So I
>
> said let me see if I can get it over to you, you know?
>
> CHS-1: Yeah let me- I'm gonna have to talk to my people
>
> about that.  Um, I mean-
>
> M: Man, please.
>
> C: It's good news-
>
> M: Hey look, Imma, Imma have the Face-to-Face for you
>
> too…I got the other doctor, all I gotta do is call him.

74.    Toll records from Sprint for Subject Device 2 identified

additional calls between the number and other phone numbers associated

with individuals known to by law enforcement to be involved in health care

fraud.  For example, between June 15, 2017 and May 16, 2019, there were

458 calls between Subject Device 2 and (248) 789-0211.  Open source

databases, as well as information from two additional confidential human

sources (CHS-2 and CHS-3) in September 2016 and March 2018, identified (248) 789-0211 as belonging to Individual UY.  CHS-2 and CHS-3 have each provided information which has been found to be credible and reliable in the past.  CHS-3 provided a business card and copies of checks which were the proceeds of illegal kickbacks to corroborate the information provided about Individual UY.  Both CHS-2 and CHS-3 identified Individual UY as a patient marketer involved in receiving illegal kickbacks. Based on the reporting, Individual UY operates his own company which works with multiple home health care agencies to provide patients in exchange for illegal kickbacks.

75.     Additionally, there were 76 calls from May 30, 2017, to July 13, 2017, between Subject Device 2 and phone number (313) 588-6348. Open source databases and reporting from the Financial Crimes Enforcement Network ("FINCEN") from 2015 and 2016 identified (313) 588-6348 as belonging to SHAH.  As previously noted, SHAH was indicted by the FBI in July 2017 for charges related to health care fraud and illegal kickbacks related to home health services at Exceptional Home Health Care Inc. from 2007 until July 2017.  *See case no. 2017-cr-20467.*  On April 22, 2019, SHAH pled guilty to one count of Conspiracy to Commit Health Care Fraud and Wire Fraud and one count of Conspiracy to Pay and Receive

Health Care Kickbacks.  *Id.*

76.     There were also 41 calls from June 27, 2018, to August 30, 2018, between Subject Device 2 and phone number (313) 575-8111.  Open source databases identified (313) 575-8111 as belonging to Individual MD who is a Physician's Assistant.  Individual MD was interviewed by the FBI in May 2017 and provided this telephone number as her cell phone. Reporting from a confidential human source (CHS-4) identified Individual MD as soliciting illegal kickbacks in exchange for patient referrals for home health care.  CHS-4 has previously provided information found to be credible and reliable.  CHS-4 has also conducted consensual recordings at the direction of the FBI which corroborated information previously provided.

77.     Records related to Subject Device 1 were obtained from Sprint via subpoena.  These records identify the subscriber as Janay Schaffer, 38855 Plumbrook Drive, Farmington Hills, Michigan.  This is the same address associated with phone number Subject Device 2 and is the known residence of MATTHEWS.

78.     As noted above, telephone number Subject Device 1 sent MMS and SMS messages containing patient information to CHS-1 on June 4, 2019.  This was the day after CHS-1 purchased two patients from

MATTHEWS.  Toll records showed this number was in contact with other

parties to this scheme.  There were 1,007 contacts (12 text messages and 995

voice calls) with (248) 506-2658, a number which open source databases

and FINCEN reporting identified as belonging to Janay Schaffer, the

Resident Agent for OAKVIEW according to LARA filings.  There were 944

contacts (4 text messages and 940 voice calls) with (248) 506-5891, a

number which open source databases, CHS-1 reporting, and bank records

show as belonging to MATTHEWS' wife Yolanda Matthews.  There were

also 882 voice calls with Subject Device 2.

79.    CHS-1 identified Subject Device 3 as the phone number for the

cellular telephone which MATTHEWS talked more freely on.  During the

meeting on June 14, 2019, which CHS-1 recorded and Affiant has reviewed,

MATTHEWS discussed this and his use of multiple phone numbers in

general:

> MATTHEWS: This is like, uh, a minute phone from the dollar
>    store.
>
> CHS-1: Yeah.
>
> M: I just put minutes on it-
>
> C: Oh.
>
> M: So I can't really talk on this phone.  This is, you know,

regulated from the government, so-

C: Yeah, yeah.

M: I try not to do too much talking on this one.

C: Yeah, yeah.

M: But this one right here, I can actually talk on. But I don't got
him programmed in here, but-

C: That's the one I talk to you on though, right? Just so I know
which one to-

M: This is the, the- this the 248.

C: Okay.

M: This the one I don't like to talk on.

C: Okay.  The 433 we good.

M: We can talk-

C: Okay, perfect.

M: On that one-

C: Perfect, yup.

M: You know what I'm saying? But this one, if you need to fax
me anything, do it on this one.

C: I got you.

M: I mean, um, text-

C: Text.

M: or anything.

C: I got you.

M: I mean, as long as you don't say anything wrong.

80.     Toll records for Subject Device 3 showed there were 23 calls between this number and CHS-1.  There were also 101 calls and 12 text messages with Individual UY, 20 calls with the number identified as belonging to MATTHEWS' wife, and 5 calls with (248) 254-3279 which open source databases identified as belonging to Company B.

81.      Records related to Office Line 1 were obtained from Comcast via subpoena.  These records identify the subscriber as Matthews Enterprise, 18966 Greenfield Rd, Detroit, Michigan and relate to a land-line telephone.

82.     According to Medicare documents, Office Line 1 was provided to Medicare as one of the contact numbers from OAKVIEW.  Toll records showed this number had 90 contacts with Wisconsin Physician Service, a Medicare contractor.  There were also 6 calls were Individual UY and 10 calls with (248) 268-3733.  Open source databases identified this number as belonging to Company C, the physician's office which faxed the patient referrals to CHS-1.

## H. USE OF COMPUTERS

83.     Affiant has reviewed consensual video recordings made by CHS-1 at the direction of law enforcement of his/her interactions with MATTHEWS at 18954 - 18966 Greenfield Road, Detroit, Michigan.  While reviewing one of the recordings made by CHS-1, Affiant observed a computer in what CHS-1 identified as MATTHEWS' office.

84.     On August 9, 2019, Affiant spoke to former OAKVIEW employee DG.  Employee DG initially stated that he/she did not believe that OAKVIEW used computers during its tenure, but then stated that there may be a computer in MATTHEWS' office.

85.     Additionally, CHS-1 has told Affiant that there is a computer in MATTHEWS' office.

## V. <u>LOCATION TO BE SEARCHED</u>

86.     This affidavit is made in support of an application for a warrant to search the business known as New Beginnings Adult Center, Inc. operating at 18966 Greenfield Road and 18954 Greenfield Road, Detroit Michigan 48035. Based on my investigation, knowledge, experience, and training, I know that medical providers store and maintain documents related to their patients and their medical practice and that these documents can include, but are not limited to billing and patient communications, treatment

plans, medical charts, documents reflecting diagnoses, progress notes,

patient bills, receipts of paid bills and claims for reimbursement, and other

business and financial documents. I seek to seize any and all such documents

and records (in whatever form stored – hard copy or by electronic media).

87. As noted above, Medicare and LARA records reflect the

business locations of OAKVIEW and NEW BEGINNINGS to be 18966

Greenfield Road and 18954 Greenfield Road, respectively. Affiant

conducted physical surveillance on multiple occasions in May and June

2019 in the general area of 18966 and 18954 Greenfield Road. These two

addresses were found to be different offices within the same office building.

Signage at 18966 Greenfield observed in May 2019 indicated it was the

location of OAKVIEW. That signage has since been removed. Affiant

observed what appeared to be patients in the rear of this office building

waiting to enter. The patients were waiting outside of a door labeled 18954.

88. CHS-1 reported that MATTHEWS' day care facility, which

CHS-1 only knew as OAKVIEW despite the change in Medicare billings,

consisted of multiple addresses within the same building. Upon entering the

building, the facility was made up of multiple large rooms which were all

connected. In reviewing the video recordings, Affiant made the same

observations, noting that the facility primarily consisted of three to four

large rooms.  Affiant also observed signage within the facility which showed they were still using the OAKVIEW name.

89.    CHS-1 provided a drawing of the layout of the facility and identified MATTHEWS' office.

90.    NEW BEGINNINGS is actively billing Medicare.  The business submitted claims and was paid for psychotherapy as recently as July 2019.

## VI.    REQUEST TO SEIZE CELLULAR TELEPHONES

91.    Based on my training and experience, owners and operators of medical and home health care offices, as well as conspirators in an illegal scheme, rely upon cellular or mobile telephones in order to communicate via telephone, text messaging, and email. This data is often crucial in identifying other co-conspirators and the details of criminal activity.

92.    As articulated above, CHS-1 advised agents s/he had discussed matters involving the purchase of patient information with Matthews using multiple cellular telephone numbers, including Subject Device 1, Subject Device 2, and Subject Device 3. Additionally, I know that phone numbers associated with MATTHEWS were in communication via text message and over voice calls with a number of other individuals associated with

OAKVIEW and NEW BEGINNINGS and others known to law enforcement to be involved in health care fraud.

93.    Based on the information above, there is probable cause to believe that Subject Device 1, Subject Device 2, and Subject Device 3, currently serviced by Sprint, were used in a conspiracy to defraud Medicare, a scheme to defraud Medicare, and/or a conspiracy to pay and/or receive healthcare kickbacks.

## VII.   REQUEST TO SEIZE COMPUTERS AND RECORDS

94.    Based on my training and experience, business offices rely upon computers to create and store data, including billing data.  It is likely that the provider's insurance billing and patient records, documents, and materials will be found stored on computers in their respective offices.

95.    For the reasons stated above, there is probable cause to believe that one or more computers in the offices at the Subject Premises were used to generate false billings and contains information including records, documents, and materials relating to these crimes.

96.    Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (Computer Personnel) will access any computer equipment and storage devices to determine whether these items can

be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data.

97. If the Computer Personnel determine that the data reviewed does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time from the date of seizure unless further authorization is obtained from the court.

98. Authority is sought to search any computer hardware or computer related equipment capable of creating and/or storing information in electronic or magnetic form. Computer related equipment includes, but is not limited to, central processing unit(s), and/or peripheral equipment used to facilitate the creation, transmission, encoding or storage of information. Agents seek the authority to search for any or all information and/or data stored in the form of magnetic or electronic encoding on computer media, or on media capable of being read by a computer, or with the aid of computer related equipment. This media includes, but is not limited to, floppy disk(s), fixed hard disk(s), removable hard disk cartridge(s), tape(s), laser disk(s), videocassette(s), CD-ROM(s), zip disk(s), smart card(s), memory stick(s), memory calculator(s), PDA(s), and/or other media that is capable of storing magnetic coding.

99.    If occupants of the premises are unwilling to cooperate with the agent(s) regarding the operation of an on-site computer system(s), and/or it appears that there is/are data security devices involved, or the computer system(s) utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment.  If the agent determines the material found on the premises is too voluminous in size, and/or for any technical reason the agent(s) on the scene cannot search for or image/copy the information found on the premises, the computer system(s) and media may be seized.  Authority is sought to seize software, documentation and instruction manuals, operating logs and manuals, utility programs, compilers, interpreters, cabling and connectors, or any other equipment, programs, or software used to facilitate direct or indirect communication with the computer hardware and/or software.

100.    In most cases, a thorough search of the premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to

ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

101.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, authority is sought to seize or image storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant.  The examination may require techniques, including but not limited to computer assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## VIII.   **SPECIAL INSTRUCTIONS REGARDING REVIEW OF SEIZED MATERIALS**

81. With respect to law enforcement's review of the seized material identified in Attachment B, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized material (collectively, the

"Review Team") are hereby authorized to review, in the first instance, the seized material.

82.     If, during the review of the seized material, the review team finds potentially privileged materials, the review team will: (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue.  Nothing in this Instruction shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.

## IX.     <u>CONCLUSION</u>

102.   Based on the foregoing, there is probable cause to believe, and I do believe, that the Subject Premises, further described in Attachment A, will contain the items set forth in Attachment B, which constitute evidence, fruits of crime, contraband, and/or instrumentalities of the violations of Title 18 U.S.C. § 1347, Health Care Fraud, Title 18 U.S.C. §1349, Conspiracy to Commit Health Care Fraud, Title 42, U.S.C. § 1320a-7b(b)(2)(A), Payment of Kickbacks in Connection with a Federal Health Care Program,  Title 42 U.S.C. § 1320a-7b(b)(1)(A) Soliciting and/or Receiving Kickbacks in Connection with a Federal Health Care Program, and Title 18 U.S.C. § 371,

Conspiracy to Defraud the United States and Pay Health Care Kickbacks.

## X.   REQUEST FOR SEALING

103.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Stephen T. Osterling, Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my
Present and/or by reliable electronic means.

Hon. Anthony P. Patti
UNITED STATES MAGISTRATE JUDGE
Dated:    August 14, 2019

## ATTACHMENT A – Premises to be Searched

The premises to be searched are:

18954 and 18966 Greenfield Road, Detroit, Michigan are units within a commercial building located near the southeast corner of the intersection of Greenfield and West Seven Mile Roads. Facing Greenfield Road, the building consists of tan bricks in its lower portion and dark red bricks at the top.  The various store fronts are numbered and reflect the addresses listed above.  The rear of the building is made up of gray cinder blocks, some of which have been painted white.

18966 Greenfield is the second unit from the north.  Facing Greenfield Road, it has a bluish door.  Above the door is a sign that reads, "Community House 18966 Greenfield".  The rear of the unit contains what CHS-1 identified as the employee entrance to OAKVIEW.  The building is white cinder block and the entrance is a black security door over another solid door.

18954 Greenfield is in the middle of the commercial building.  It has glass windows and a glass door entrance.  To the left of the door are the numbers 18954.  The rear of the unit is gray cinder block and contains two blue-gray doors with "18954" in white numbers.  CHS-1 identified these as the patient entrances.

1

Overhead view from Greenfield Road



View  of Selection above from Greenfield Road



18966 is the unit on the left; 18954 is the unit on the right.

Overhead view from rear of building



View from alley behind building – left selection from above



<u>View from alley behind building – middle selection from above</u>



<u>View from alley behind building – right selection from above</u>



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

For the time period of October 1, 2014, to present - any and all of the following items concerning or related to any individual or entity, known or unknown, who is reasonably believed to be part of the scheme or a beneficiary of the scheme described in the affidavit.

This information may be stored or filed and includes any format in which the information may exist, including, without limitation, the media of hard copy, computer hard disc, digital storage devices, and computer discs:

1. All records related in any way to patients of any of the above persons or businesses, including, without limitation, the following type of records: patient charts, files, records, insurance cards, licenses, identification cards, treatment cards, prescription records, patient ledger cards, patient complaints, patient sign-in sheets, appointment books, telephone logs, physician notes, nursing notes, medical assistant notes, social worker notes, original patient or referral source listings.

2. All documents constituting, concerning, or relating to bills, invoices and claims for payment or reimbursement for services billed to insurance companies, including Medicare, for any patients.

3. All financial and tax-related books, records and documents related in any way to the above persons or businesses, including, without limitation:

   a. Bank accounts, money market accounts, checking accounts, equity line of credit, investment accounts, stock fund accounts, bonds or bond funds; including deposits and disbursements, canceled checks or drafts, electronic transfers, ledgers, loan statements, and loan agreements;

   b. Credit/Automatic Teller Machine/Debit card accounts;

1

    c.  All corporate, business, and personal tax returns, including, without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Form 1099s;

    d.  All loan and credit information, including, without limitation, any letters of credit, revolving credit arrangements, loans, loan applications, financing arrangements, factoring arrangements, promissory notes, leases, or any other documents concerning sources of borrowed funds, including any applications;

    e.  All information relating to the purchase, titling and insurance of vehicles, real estate and other assets, including safe deposit boxes and keys;

    f.  All financial statements, accounts payable/receivable, and credit reports.

4.    Documentation of all patient appointments or scheduling and patient sign-in sheets.

5.    All documents consisting, concerning or relating to all current and former employees, including, without limitation, personnel files, employee rosters, names, addresses, telephone numbers, email addresses, time cards or similar records, expense reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements and W-2 forms.

6.    All documents constituting, concerning or relating to work and personal diaries, calendars, logs, appointment books, and schedules.

7.    All documents related to the purchase, leasing, servicing or operation of any physical therapy equipment.

8.    All records related to any payments made to patients or patient recruiters/marketers to induce patients to seek treatment from any of the above referenced individuals or business.

9.    All invoices and supporting documentation evidencing monies owed to or received from any of the above referenced individuals or business.

2

10. All contracts, billing agreements, professional services agreements, or any other contracts between the above referenced individuals or business, and any other individual, company, physician or billing company.

11. All Medicare handbooks, manuals, instruction materials, newsletters or other Medicare publications.

12. Records of control over other areas such as storage units where financial, medical or other billing records may be maintained.

13. Records of control of the premises and things described, namely, utility bills, telephone bills, rent or lease records pertaining to or evidencing ownership or control of the premises to be searched.

14. All retrievable information such as recorded telephone messages, and other electronically stored information and computer hardware, including, without limitation, floppy discs, compact discs or other data storage discs or tapes, thumb or flash drives. Any electronic storage media, including, without limitation, cellular telephones, pagers, electronic organizers, and PDAs, which may be held for such reasonable time as necessary to determine whether it contains data within the ambit of this warrant. Where data is found on a personal computer storage drive file, the agents executing this search warrant are authorized to seize, where necessary, the computer system's input/output or "I/O" devices, software, documentation, and data security devices. When the computer analyst determines that these items are no longer necessary to retrieve and preserve that data evidence, they will be returned within a reasonable time.

15. Instructions, memoranda, passwords, and other information relating to, or required to facilitate the operation of any computer equipment which contains any of the aforesaid information.

16. Organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, including, without limitation, articles of incorporation, by-laws and annual reports.

17. All correspondence, including memoranda, letters, and electronic mailings (emails) concerning any of the records described in the previous paragraphs.

18.   Currency or other items of significant value reasonably believed to be proceeds, fruits or instrumentalities of the illegal activity described in the affidavit for this search warrant.

19.   Records related to assets or items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.

20.   Regarding records and information pertaining to the above stated offense which may be stored in digital form, law enforcement personnel executing this search warrant will employ the following procedure in searching for data capable of being read, stored or interpreted by a computer:

a.   Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether or not these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b.   If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the preservation of the data, then the computer personnel will determine whether it is practical to copy/image the data.

c.   If the computer personnel determine it is not practical to perform on-site searching, copying or imaging (due to time, technical or other considerations), then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.   The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d.   Any data storage device that is encrypted and unreadable will not be returned until law enforcement personnel have determined that it or its data do not constitute (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed property, or (5) items that fall within the list of items to be seized set forth within.

e. In searching the data, computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.

f. If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41 (b), the government will return these items within a reasonable period of time.

g. In order to search for data pertaining to the above stated offenses that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

    i. Any computer equipment and storage device capable of being used to commit or store evidence of the offenses listed above;

    ii. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including but not limited to word processing equipment, modems, docking stations, monitors, printer, plotters, encryption devices, and optical scanners;

    iii. Any magnetic, electronic or optical storage device capable of storing data such as floppy disks, fixed hard disk drives, external hard drives and enclosures, network attached storage units, removable hard disk cartridges, tapes, laser disks, videocassettes, CD's, DVD's, zip disks, smart cards, memory sticks, memory calculators, PDA's, USB flash drives, printers and fax machines with memory buffers, PC cards, electronic dialers, electronic notebooks, mobile telephones, answering machines and/or other media that is capable of storing magnetic coding;

    iv. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, or software;

v. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi. Any physical keys, encryption devices or similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii. Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.

21. The terms "records," "documents," "communications," and "applications," include all of the foregoing items of evidence in whatever form and by whatever means such records, documents, communications, applications, their drafts or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing or drawing with any implement, on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, videotapes, photocopies); any mechanical form (such as printing or typing); any electrical, electronic or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard drives, backup tapes, CD ROMs, optical discs, printer buffers, smart cards, memory calculators, or electronic notebooks, as well as printouts and readouts from any magnetic storage device).

# ADDENDUM TO ATTACHMENT B

With respect to law enforcement's review of the Devices, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the Devices (collectively, the "Review Team") are hereby authorized to review, in the first instance, the Devices and the information and materials contained in them, as set forth in this Attachment B.

If law enforcement determines that all, some, or a portion of the information or materials on the Devices contain or may contain information or material subject to a claim of attorney-client privilege or work-product protection (the "Potentially Privileged Materials"), the Review Team is hereby ordered to: (1) immediately cease its review of the specific Potentially Privileged Materials at issue; (2) segregate the specific Potentially Privileged Materials at issue; and (3) take appropriate steps to safeguard the specific Potentially Privileged Materials at issue.

Nothing in this addendum shall be construed to require law enforcement to cease or suspend the Review Team's review of the Devices upon discovery of the existence of Potentially Privileged Materials on one or more of the Devices.

AUSA:   John McCormack IV      Telephone:  (202) 262-7011

AO 93  (Rev. 11/13) Search and Seizure Warrant      Agent:      Stephen T. Osterling      Telephone:  (313) 815-7887

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Michigan

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | Case: 2:19-mc-51174 -1 |
| *or identify the person by name and address)* | ) Case No. | Judge: Battani, Marianne O. |
| NEW BEGINNINGS ADULT CENTER | ) | Filed: 08-14-2019 At 11:19 AM |
| INC. / OAKVIEW ADULT DAY CARE | ) | IN RE:SEALED MATTER(SW)(MLW) |
| 18954 – 18966 Greenfield Road | ) | |
| Detroit, Michigan 48235 | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before   August 27th, 2019 _____   *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty  .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   August 14, 2019   10:57 am

Judge's signature

City and state:   Detroit, MI   _____      Hon. Anthony P. Patti   U. S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| **Certification** |
|---|

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*